IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.   ) | Case No.: 1:22-cr-00181-JEB |
| ) | |
| DOUGLAS FARQUHAR MACRAE ) | |
| ) | |
| Defendant.    ) | |

**DEFENDANT'S POSITION WITH REGARD TO SENTENCING FACTORS**

Douglas Macrae is a kind man. As the enclosed letters to the Court detail, he has literally opened his house to a homeless man in Arlington. He takes in sick dogs that others can no longer care for. He performs free yard work for his widowed neighbors. These are not hurried acts of service meant to impress the Court, but a lifetime of everyday kindnesses to those in his community. He is, nevertheless, a flawed man, and his decision to enter the U.S. Capitol Building on January 6, 2021 is one that he deeply regrets. The three minutes he spent inside was the biggest mistake of his life, and one that he will work the rest of his life to overcome. Given Mr. Macrae's character and his history, including his remorse and conduct in the 21 months since January 6th, he joins the Probation Office in requesting a sentence of 12 months' probation and community service – which is justified by the statutory purposes of sentencing. Nothing like this had ever occurred before during Mr. Macrae's life, nor will it again.

Mr. Macrae has spent his entire life in search of community and approval from others. He is an only child who endured a difficult childhood punctuated by periods of paternal absence, alcoholism, and physical abuse. His mother, though physically present, was herself emotionally absent at best – emotionally abusive at worst.

Mr. Macrae's conduct in this matter is an aberration. As this memorandum and the attached letters from those who know him best demonstrate, his actions on January 6th are at odds with the

selfless, largely law-abiding life he has built over the course of the past sixty years. Though Mr. Macrae's entry into the U.S. Capitol Building that day was without question unlawful—something he has freely admitted and for which he is extremely remorseful[1]—his entry was not driven by malicious intent, a desire to interfere with the certification proceedings, or to otherwise overthrow the U.S. Government. To the contrary, and although profoundly misguided, he was drawn to the Capitol out of a sense of curiosity and nostalgia, particularly given his prior employment in the Capitol as a printer. Mr. Macrae did not violently force his way inside, but rather, entered an unlocked door on the East side of the Capitol. During the brief time he was inside the building, Mr. Macrae did not harm anyone or anything and left voluntarily once he observed the gravity of the situation.

## I. MR. MACRAE'S PERSONAL BACKGROUND AND CHARACTER COUNSEL IN FAVOR OF PROBATION

Despite a challenged childhood, Mr. Macrae is a man who does not hesitate to assist and uplift others. Despite the physical and emotional abuse to which he was subject in his formative years, he is a caring and helpful neighbor, devoted son, and a friend to those from all walks of life. Despite his modest means, he is a diligent worker who frequently gives of his time and treasures to others. Mr. Macrae is a kindhearted man who has sought to improve the lives of those in his community at every turn, and who – despite his flaws – has led a life of kindness and compassion.

---

[1] On the advice of counsel, Mr. Macrae stipulated to the conduct outlined in the Statement of Offense (*see generally* ECF No. 21) and did not provide a statement to the Probation Officer as part of the presentence investigation report interview. PSR ¶ 17. He has, however, prepared a statement that he anticipates presenting to the Court at the upcoming sentencing hearing.

2

### A. Beset by Challenging Beginnings, Mr. Macrae has Lived a Quiet Life in Service to Family and Community

Douglas Farquhar Macrae, Jr. was born on June 11, 1962 in Arlington, Virginia, and has spent his entire life in the Washington D.C. metropolitan area. PSR ¶¶ 33, 40. He is the only child born to Douglas Macrae and Clara Dell Macrae and has three half-siblings born from his father's prior marriage. PSR ¶ 34. Though his parents married, their marriage was short-lived and unhappy. Mr. Macrae's father and namesake was an alcoholic who was physically abusive to him and his mother. PSR ¶ 34.

After his parents separated, Mr. Macrae's childhood continued to be a fraught one. His mother, an administrative assistant for various members of Congress over the course of her 43 years of federal service, worked to materially provide for Mr. Macrae. PSR ¶ 35. She was, however, herself an alcoholic with a mean temper, and was emotionally abusive, withheld affection from Mr. Macrae, and mocked him when he expressed his love for her. PSR ¶ 35; Ex. A, I. Macrae Letter at 9[2]. She "had a way of zeroing in on one's faults with malicious glee" and Mr. Macrae was often in the crosshairs. Ex. A, I. Macrae Letter at 9. Although he fervently loves his mother, who is now 100 years old, wheelchair bound, diagnosed with dementia, and residing in an assisted living facility, Mr. Macrae suffers from frequent nightmares—many of which feature her. PSR ¶ 35.

Despite this challenged relationship with his mother, Mr. Macrae is a "loyal and sincere son." Ex. A, S. Enginar Letter at 7. To counsel, he described her as his best friend. When his mother grew increasingly advanced in age and unable to care for herself and her home, Mr. Macrae

---

[2] Letters in support have been filed via ECF as Exhibit A. Page numbers appear on the bottom righthand corner of Exhibit A to allow for pin cite identification. Exhibit A will be cited as "Ex. A, [Sender] Letter at [page]."

moved back home to help care for her, in the hopes of allowing her to reside in her home as long as possible. PSR ¶ 36; Ex. A, J. Steven Letter at 13; Ex. A, L. Terminella Letter at 14. He dutifully shouldered this burden alone, at times enduring violent and abusive outbursts from his mother, for several years. Ex. A, D. Edelbrock Letter at 4. When the care and attention she required became more than he could handle, Mr. Macrae helped his mother relocate to a facility that could better provide for her medical needs. PSR ¶ 35. Mr. Macrae continues to reside in his mother's home, looking after the property and caring for her elderly, blind dog named Duncan while she remains in assisted living. Ex. A, S. Enginar Letter at 7; PSR ¶ 36.

Mr. Macrae's caring nature extends beyond familial bonds to members of his faith-based community, neighbors, and to area homeless, among others.[3] Prior to her passing, Mr. Macrae looked after an elderly, widowed, long-time member of his church, by making numerous repairs to her home for free. Ex. A, D. Edelbrock Letter at 4. For nearly a decade, he has provided free yardwork, junk hauling services and other assistance to another elderly neighbor. Ex. A, L. Terminella Letter at 14. He has helped others in his community by readily loaning tools, clearing snow and leaves from the sidewalk, cleaning-up debris after storms, watching over homes while neighbors were out of town, receiving shipments for others, and providing free lawn care. *See, e.g.*, Ex. A, B. Thomas Letter at 15; Ex. A, J. Steven Letter at 13; Ex. A, I. Macrae Letter at 9. In sum, Mr. Macrae is "a supportive and courteous neighbor" who is valued by those around him (Ex. A, B. Thomas Letter at 15), and "has always been more than generous with his time, treasures, and talents." Ex. A, J. Steven Letter at 13.

---

[3] On one occasion, when counsel arrived at Mr. Macrae's home by bicycle, Mr. Macrae immediately took the bicycle, examined the tires, expressed concern for counsel's safety and efficiency, and inflated them to the recommended pressure.

4

Although his early career background was in printing and included employment with The Washington Post and at the U.S. Congress, Mr. Macrae was drawn to landscaping and lawn care. PSR ¶ 57.  Since 2010, he has operated a solo lawn care operation which once provided a stable yet modest source of income but is now struggling.  PSR ¶ 5; Ex. A, I. Macrae Letter at 9.  Despite his modest financial means, Mr. Macrae actively practices kindness towards those less fortunate. He delivers food and clothing to those in need, and on one winter morning gave someone who was missing a shoe one from his own foot.  Ex. A, B. Thomas Letter at 15; Ex. A, S. Montesa Letter at 11.  Mr. Macrae has befriended and cared for a number of homeless individuals in the community, including one to whom he has opened his home and counts as a friend.  Ex. A, D. Edelbrock Letter at 4; Ex. A, S. Montesa Letter at 11; PSR ¶ 40.  He has provided employment to homeless individuals so that they could earn enough for a meal and has provided transportation for others.  Ex. A, S. Montesa Letter at 11.  Mr. Macrae even once took a woman who was considering taking her life to the movies to provide her encouragement and some companionship. Ex. A, I. Macrae Letter at 9.

Finally, Mr. Macrae's quiet gestures of kindness include his love of animals. So much so that his neighbors have observed him caring for numerous injured and sick dogs over the years.  Ex. A, Barton Letter at 2. In addition to looking after his mother's dog, Mr. Macrae also cares for his adopted Beagle, "Reno."  PSR ¶ 40; Ex. A, S. Enginar Letter at 7.  Prior to adopting Reno, Mr. Macrae lovingly cared for a different canine companion – "Bingo" – for over ten years.  Ex. A, J. Ballard Letter at 1.  When Bingo passed away in late 2020, Mr. Macrae was heartbroken.  *Id*.

### B. Mr. Macrae's Desire for Community and Approval Contributed to His Involvement on January 6th

In late 2020, Mr. Macrae was deeply affected by the death of Bingo, a companion that had been a comfort to him.  In tandem with Bingo's passing, Mr. Macrae's mother – his "hero" (PSR

5

¶ 35) – was struggling with dementia and her health was deteriorating. She was in a nursing facility, and in the midst of the ongoing COVID-19 pandemic, his visits with her were limited to 20 minutes per week.

Beginning in November 2020, Mr. Macrae repeatedly informed so-called friends and contacts on Facebook that he was "in trouble" and "having depression and loneliness."[4] He shared that his mother was "suffering terribly." He asked for prayers from friends and acquaintances, some of whom would later send Mr. Macrae messages and posts that spread disinformation. In mid-December 2020, Mr. Macrae noted to a contact on Facebook that he was,

> at a low point in my life[.] I feel absolutely alone for the first time ever (58 years old)[.] No family, no friends, few acquaintances and now my dog is dead[.] I have not been able to find any peace since[.] Don't know what to do now[.] I am leaning heavily on God & the scriptures but I am still suffering from the loss and the crushing pain

Mr. Macrae was isolated and alone. The invitation to attend former President Trump's rally with his friend presented—in addition to an opportunity to witness what he thought would be Trump's last public speech as President—an opportunity for community and connection. His decision to later post photos of himself at the rally, outside of the U.S. Capitol Building, and inside of the Capitol Building itself, was partially driven by the need for approval and support from his Facebook contacts.

## II.   MR. MACRAE'S ACTIONS ON JANUARY 6, 2021

On the morning of January 6, 2021, Mr. Macrae made his way to the National Mall in tandem with a friend of his who was visiting from out of town. Mr. Macrae, a student of history,

---

[4] Statements made by Mr. Macrae on Facebook and attributed to him here and elsewhere in this submission, are excerpted from the Facebook Business Records previously produced by the Government to defense counsel. At the Court's request, counsel can provide a copy of these records.

and someone who had previously attended other popular and/or historical events on the Mall, wanted to witness what he understood could be then-President Trump's last public speech as President of the United States. He could not have anticipated what would later happen.

After listening to Trump's remarks, and at his friend's suggestion, the two walked towards the U.S. Capitol Building. As someone with a keen interest in photography, Mr. Macrae had his camera in tow and walked around the exterior of the building for some time taking photos—both with his larger camera and with his camera phone. He intentionally avoided the throngs of individuals that had gathered along the West Side of the Capitol and made his way to the East Side of the building which – at least for a time – presented a far calmer situation. As more gathered at the East Side as well, Mr. Macrae kept his distance. Later, he made his way up the staircase towards the East Front House door, at which point the entry was unsecured—having been unlocked from the inside by earlier entrants who had broken into the building. After entering, Mr. Macrae remained in main hallways and corridors, took a handful of photos – some of which he posted to Facebook – and exited after three minutes. PSR ¶¶ 13-14. He did not engage in any violence or destruction while inside the U.S. Capitol. After leaving the building he took some additional photos, and he and his friend traveled back to Arlington. The United States Probation Office has reviewed hundreds of January 6 cases, and their assessment is that Mr. Macrae's "culpability appears to be minimal in contrast with rioters who destroyed or stole government property, and/or those who assaulted or threatened the law enforcement officers on that date." ECF No. 26 at 1 (Sentencing Recommendation).

As Mr. Macrae watched the media coverage of the events of January 6th unfold, he came to a better appreciation of the extent of the unruliness and violence of the day. He more fully appreciated that his decision to enter the U.S. Capitol Building, even if motivated by curiosity and

not malevolence, was wrong and had contributed to the chaos. In the days that followed, Mr. Macrae further understood that he had been part of something deeply antithetical to his respect for the building and the institutions that he and his mother had served. He knew that law enforcement would come looking for him, so it came as little surprise to him that federal agents did just that on January 25, 2021. When interviewed by federal law enforcement agents then, and again in April 2021, Mr. Macrae was remorseful, cooperative, and helpful. He was candid about his whereabouts and conduct on January 6th, and freely provided consent to allow agents to search his phone.

Roughly one year later, Mr. Macrae was arrested and had his initial appearance before a magistrate in the Eastern District of Virginia. PSR ¶ 5. He was released on his personal recognizance, and subsequently formally arraigned in this district in connection with a four-count Information charging him with: (1) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1); (2) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2); (3) Disorderly Conduct on Capitol Grounds, in violation of 40 U.S.C. § 5104(e)(2)(D); and (4) Parading, Demonstrating, or Picketing in any of the Capitol Buildings, in violation of 40 U.S.C. § 5104(e)(2)(G). PSR ¶ 1. On July 19, 2022, after notifying counsel for the Government of his desire to reach a pre-trial resolution of this matter, Mr. Macrae accepted responsibility for his actions, appeared before this Court and pled guilty to Count Four of the Information pursuant to a plea agreement. PSR ¶ 4. By entering this plea, Mr. Macrae faces, *inter alia*, a maximum term of six months imprisonment and a fine of not more than $5,000, along with agreed restitution in the amount of $500. ECF No. 20 at 1 (Plea Agreement).

Mr. Macrae's actions since January 6th demonstrate that he has accepted full responsibility for his behavior and is sincerely remorseful. Notwithstanding his participation in the instant

offense, Mr. Macrae's minimal – and dated – criminal history, swift admission of guilt, recognition of the impact of his actions, and sincere remorse are good indicators that a probationary sentence appropriately reflects the nature and seriousness of the offense.

### III. RELEVANT SENTENCING CONSIDERATIONS

The advisory guidelines are inapplicable to Mr. Macrae's offense. PSR ¶ 65. Nevertheless, the Court must impose a sentence based on the remaining statutory sentencing factors enumerated in 18 U.S.C. § 3553(a). Those factors include: (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the need to avoid unwarranted sentencing disparities, (d) the need for restitution, and (e) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from further crimes of the defendant and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a). As part of its independent review of those factors, the Court must "consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). Indeed, the Court has emphasized that "the punishment should fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (internal quotations and citation omitted).

The factors outlined in 18 U.S.C. § 3553(a) weigh in favor of a probationary sentence. Mr. Macrae's background and personal characteristics, including his history of good deeds and caring for individuals of all walks of life, extremely low risk of recidivism, and genuine remorse, when weighed alongside the circumstances related to Mr. Macrae's conduct on January 6th and the

9

aberrant nature of the offense itself, counsel in favor of a non-incarceratory outcome. Further, a modest term of probation coupled with community service is "sufficient, but not greater than necessary" to comply with those statutory objectives. 18 U.S.C. § 3553(a).

### A. A Non-Incarceratory Sentence Satisfies Statutory Sentencing Objectives

A probationary sentence is appropriate considering the objectives outlined by Section 3553(a), including the need for the sentence imposed to reflect the seriousness of the offense and to avoid sentencing disparities among like-situated defendants. As Probation put it, "there is no perceived benefit to either the defendant or to society to be derived from an extensively punitive sentence. Thus, punishment in the context of a sentencing goal, can be accomplished by a non-custodial sentence involving a short-term of probation supervision." ECF No. 26 at 2.

### 1. The Requested Sentence of Probation Reflects the Seriousness of the Offense and Avoids Sentencing Disparities

Mr. Macrae does not minimize his behavior on January 6th; since law enforcement visited him two weeks later, he has acknowledged it was wrong. He fully appreciates that the events of January 6th involved, in the collective, an assault on the Capitol to which his conduct contributed. He is fully prepared to accept this Court's decision on an appropriate sentence.

Proportionate sentences for proportionate conduct promote respect for the law and the courts. In the context of the hundreds of individuals charged by the Government for their roles on January 6th and the range of criminal conduct committed that day, Mr. Macrae's conduct was brief, nonviolent, and not destructive of any government property. The Government has acknowledged that there is no evidence that Mr. Macrae was destructive or violent, that he espoused such views, that he encouraged any such behavior, or that he is affiliated with any extremist groups. ECF No. 24 at 10-11 (Gov't Sentencing Mem). To the contrary, Mr. Macrae expressed disappointment on Facebook that the protest was "sullied by the destructive elements

10

that caused mayhem," and condemned the violence of that day when interviewed by federal agents. His entry into the Capitol Building lasted only three minutes, he did not venture far into the building, and he did not enter any rooms inside of the U.S. Capitol. Further, when interviewed by federal law enforcement concerning his conduct on January 6th, Mr. Macrae was cooperative, compliant, remorseful, and readily provided information to agents.

Despite the Government's request, home confinement is unnecessary here. For the January 6th cases where home confinement has been deemed appropriate by the Court, the defendants' conduct is readily distinguishable from that of Mr. Macrae's. For instance, for the two defendants previously sentenced by this Court for which the Government requested such a sentence, both involved more culpable conduct.

First, in *United States v. Jones*, 21-CR-321 (JEB) – which the Government identifies in its memorandum – the defendant affirmatively removed barriers and climbed a wall to unlawfully enter the Capitol Building. Additionally, the defendant in *Jones* spent a longer period of time inside the Capitol Building: 15 minutes. Second, in *United States v. Bennett*, 21-CR-227 (JEB), the defendant posted and shared conspiracy theories about the presidential election in the lead up to January 6th, advising others to be ready for chaos and noting that he would be at the protest to fight for his freedom. The defendant in *Bennett* was inside the Capitol Building for nearly 30 minutes, yelled at police officers, and previously attempted outreach to a local chapter of the Proud Boys about prospective membership.

With respect to the other sentencing outcomes for January 6th defendants noted by the Government, those, too, are distinguishable. In *United States v. Joshua Bustle*, 21-CR-238 (TFH), the defendant was inside the Capitol Building for roughly 20 minutes, and together with his co-defendant and wife, brandished protest signs decrying the U.S. Government's efforts to vaccinate

11

the population against COVID-19. Further, before and after January 6th, Bustle's wife wrote several Facebook posts documenting their collective grievances and motivation for entering the Capitol Building, which included calling for a revolution and calling the former Vice President a traitor. Finally, in *United States v. Rosa*, 21-CR-68 (TNM), the defendant was inside the Capitol Building for approximately 20 minutes and entered through a west side entrance *after* observing rioters clash with police, and *after* hearing bangs and noticing that pepper spray had been deployed. Rosa, like Mr. Macrae, posted a picture of himself inside the U.S. Capitol to Facebook. For this behavior, and unlike the other January 6th defendants discussed here, Rosa's sentence of 12 months' probation and 100 hours of community service did not include a period of home confinement.

Accordingly, sentencing Mr. Macrae to 12 months' probation – consistent with the Probation Office's recommendation – based on the totality of his conduct, inclusive of his extensive cooperation with law enforcement, would not create any unwarranted disparities amongst similarly situated defendants.

### 2. A Probationary Sentence Provides Sufficient Deterrence and Just Punishment

The requested non-custodial sentence of probation vindicates the goals of sentencing codified at Section 3553(a)(2) – namely, imposition of a sentence that provides for both specific and general deterrence, and that provides "just punishment." *Gall v. United States*, 552 U.S. 38, 50 & n.6.

Mr. Macrae has minimal criminal history—a handful of decades-old convictions/charged conduct largely comprised of drug possession offenses.[5] In the 21 months since January 6, 2021,

---

[5] While Mr. Macrae does not have a spotless record, this extremely dated conduct occurred well over 20 years ago in some cases, and over 30 years ago in others. Mr. Macrae was either 19

he has had zero new arrests and has fully cooperated with law enforcement and Pretrial Services. No period of incarceration is necessary to deter Mr. Macrae from committing any future crime, nor is it necessary to serve the purpose of general deterrence. The quantity and severity of sentences in the hundreds of January 6th cases prosecuted by the Government, as well as the Government's overwhelming success at trial, has accomplished deterrence more than any sentence in this case ever could.

The Supreme Court has recognized that supervision imposes a serious restriction on a person's liberty. *See Gall*, 552 U.S. at 48. Individuals on supervision are "nonetheless subject to several standard conditions that substantially restrict their liberty." *Id.*; *see also United States v. Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled.") (internal citation omitted). Mr. Macrae is currently being supervised by the United States Probation Office and has been cooperative and compliant with the conditions of his bond. His ability to maintain a crime-free presence in the community since the offense, and his excellent adjustment while on pretrial supervision, demonstrates the adequacy and appropriateness of the requested sentence.

Home confinement is inappropriate because it is "greater than necessary" to meet the objectives of sentencing. Mr. Macrae is self-employed and makes a poverty-level income working in landscaping. His success depends on flexibility and responsiveness to his loyal customers with whatever they might need. Several examples illustrate the point. Landscapers like Mr. Macrae

---

years old, or in his twenties for all but one of these offenses. None of these convictions are for violent offenses, many are related to marijuana possession, and at least two of the charges identified were "no papered"—*i.e.*, not prosecuted. Counsel also notes that one of the more recent convictions (*see* PSR ¶ 24) is for constitutionally protected conduct that is no longer criminalized, and further, that had the Sentencing Guidelines been applicable to Mr. Macrae's offense, he would have no criminal history points. PSR ¶ 68.

13

are at the mercy of weather every day, and work cutouts from Probation are unlikely to be able to accommodate the time-sensitive flexibility Mr. Macrae requires to catch up on work after bad weather strikes. Similarly, when Mr. Macrae visits prospective new customers to give an estimate, these meetings are scheduled around the demands of customers' schedules and might require time-sensitive visits.  (Such meetings are in contrast to the work itself, which does not require the customer to be at home.) Adding the logistics of home confinement and layers of approval for short-notice work would threaten his livelihood in a way unjustified by any need for additional punishment.

An additional concern with home detention is that Mr. Macrae's mother is 100 years old and in rapidly declining health at an Arlington assisted living facility.  She can no longer speak or acknowledge his presence with more than a smile.  If her health continues to decline, the logistics of approving visits could cut into their remaining time together, particularly in time-sensitive circumstances.

Mr. Macrae asks that the Court also consider these obligations when determining the extent of any community service imposed.

Finally, Mr. Macrae has faced – and for the rest of his life will continue to face – collateral consequences that serve the statutory goals of sentencing.  Not long after he was identified and charged, Mr. Macrae received media inquiries.  His name and likeness appeared in online news publications.  He continues to experience the attendant public shame and fallout—he has lost friendships that he values; his modestly successful business providing landscaping and lawn care is struggling.[6]  *See also* Ex. A, D. Edelbrock Letter at 4.  He will forever carry the stigma associated

---

[6] At the request of counsel, Mr. Macrae accounted for clients who terminated their business after his arrest became public in the Arlington media.  He estimates that he has lost at least six weekly clients, totaling approximately $1,040 each month in lost regular business, which does not

14

with a day that is historic for all the wrong reasons.  Going through this legal process has caused Mr. Macrae mental and emotional anguish.  These lessons are painful and permanent.  Mr. Macrae will not stray from his otherwise law-abiding life again, and no additional punishment is necessary to deter future misconduct by this defendant.  Mr. Macrae is not someone that this Court will see again.

## CONCLUSION

What happened on January 6th was shocking and reprehensible.  Mr. Macrae understands that his presence at the U.S. Capitol that day and foolish decision to enter the Capitol Building itself contributed to the disorder and chaos that unfolded.  For that he is deeply and profoundly remorseful.  In the aftermath of January 6th, Mr. Macrae expressed disappointment that the day had devolved into violence and destruction, and immediately returned to his quiet existence.  Both before and after January 6th, Mr. Macrae has been an asset to those around him, as he has continued to look for ways to uplift and support others.

Mr. Macrae's participation in the events of January 6, 2021 merits punishment. In considering that punishment, he asks that the Court look beyond the simple fact of his participation to the relatively minor extent of his participation, his minimal criminal history, his demonstrated character, and his cooperation and success with Probation thus far.

For the reasons discussed herein, and consistent with the Probation Office's recommendation, Mr. Macrae respectfully requests that this Court impose a probationary sentence of 12 months and community service as sufficient but not greater than necessary to achieve the goals of sentencing in this case.  As further related to any term of community service imposed,

---

include less frequent, larger jobs (mulching, lawn renovation, bush trimming, large cleanup work).

15

counsel respectfully requests that the Court allow Mr. Macrae to identify an animal shelter or similar organization in the Arlington area at which to serve.

Dated:  October 14, 2022

Respectfully submitted,

DOUGLAS MACRAE, JR.

By counsel,
Geremy C. Kamens
Federal Public Defender

_____/s/_____
Tiffany Wynn
Volunteer Attorney
D.C. Bar No. 1011424
Virginia State Bar No. 82832
Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, VA 22314
T: 703.600.0800
F: 703.600.0880
Tiffany_Wynn@fd.org

Nathaniel Wenstrup
Assistant Federal Public Defender
Virginia State Bar No. 96324
1650 King Street, Suite 500
Alexandria, VA 22314
Nate_Wenstrup@fd.org
(703) 600-0825 – direct
(703) 800-0880 – fax

## CERTIFICATE OF SERVICE

      I hereby certify that on October 14, 2022, I will electronically file the foregoing with the Clerk of court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

                                                                             _____/s/_____
                                                                             Nathaniel Wenstrup
                                                                              Assistant Federal Public Defender
                                                                              Virginia State Bar No. 96324
                                                                              1650 King Street, Suite 500
                                                                              Alexandria, VA 22314
                                                                              Nate_Wenstrup@fd.org
                                                                              (703) 600-0825 – direct
                                                                              (703) 800-0880 – fax